FILED
CLERK, U.S. DISTRICT COURT

MAR 11 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIANNE CARAFANO (aka CHASE MASTERSON, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>METROSPLASH.COM, INC., a Delaware corporation, LYCOS, INC., a Delaware corporation; MATCHMAKER.COM, INC., a Texas corporation, BRADLEY R. TYER, an Individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. CV 01-0018 DT (CWx)<br><br>ORDER **GRANTING** DEFENDANTS LYCOS, INC. AND METROSPLASH.COM, INC.'S MOTION FOR SUMMARY JUDGMENT |

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 12 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## I.    **Background**

### A.    **Factual Summary**

This action is brought by Plaintiff Christianne Carafano (aka Chase Masterson) ("Plaintiff") against Defendants Metrosplash.com, Inc., Lycos, Inc.,

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

96

1   Matchmaker.com, Inc. and Bradley R. Tyer for invasion of privacy,

2   misappropriation of right of publicity, defamation and negligence.[1]

3          The following facts are found to be undisputed[2]:

4          Plaintiff is an actress who goes by the stage name of "Chase

5   Masterson." Plaintiff has appeared in numerous movies and a long-running

6   television program, Star Trek: Deep Space Nine, in which she had a prominent

7   recurring role. Her character, Leeta the D'abo girl, was popular with fans. In

8   addition to acting, Plaintiff makes a living from public appearances at Star Trek

9   conventions and other fan events.

10          Matchmaker.com ("Matchmaker") is a service, accessed from the

11   World Wide Web, that permits members to search a database containing of

12   profiles posted by other members. Matchmaker has 79 "communities," 62 of

13   which focus on particular cities, states or regions. Eleven communities focus on

14   age groups, religious interests and lifestyles. There are six international

15   communities. Matchmaker has more than 200,000 members. Many of

16   Matchmaker's members are "trial members," who can use the service for a limited

17

18   ————————————

19          [1] "Matchmaker.com, Inc." is the former name of Metrosplash.com, Inc.
     Metrosplash.com, Inc. continues to do business under the name Matchmaker.com.

20   Matchmaker.com is owned and operated by Lycos, Inc., which purchased

21   Metrosplash.com, in July 2000. ("Defendants" will collectively refer to
     Defendants Lycos, Inc. and Metrosplash.com, Inc.)

22

23          [2] In making this determination, this Court examined Defendants' Proposed
     Statement of Uncontroverted Material Facts, Plaintiff's Statement of Genuine

24   Issues and Defendants' Response to Plaintiff's Statement of Genuine Issues, as

25   well as all supporting evidence. Furthermore, this Court has reviewed both
     parties' objections to evidence, and while some objections are moot because this

26   Court did not rely on that evidence, to the extent evidence is included in this Order

27   to which objections have been made, said objections are deemed overruled.

28                                            2

1  period at no charge. To continue after the trial period has expired, a member must
2  agree to pay a monthly fee.

3     To join Matchmaker, a new member fills in an application, which
4  requires an email address to be included. Upon completion, Matchmaker sends an
5  automatic "welcome email" to the email address provided. If a person were to
6  reply to the "welcome email," it goes to the system operator (i.e. customer service
7  representative) for that website. The new member must also complete a
8  questionnaire of up to 62 multiple-choice questions and must answer at least one
9  of a series of essay questions and may post up to 10 photographs. Matchmaker
10 tailors its questionnaires for each Matchmaker community, so that they vary from
11 one website community to another. The questions, answers to the questions, and
12 the optional photographs become the data that makes up the member's "profile."
13 The data provided by the member is stored on Matchmaker's servers. When the
14 profile is called up by the member, or by other members during searches of the
15 Matchmaker database, it is displayed in a standard format. A profile is constructed
16 anew by Matchmaker's servers, using a script that causes the member's browser to
17 display the profile information with the standard graphic elements designed by
18 Matchmaker each time the profile is called up for viewing. Membership is
19 anonymous. Each member selects a name to which the system automatically
20 appends an arbitrary number so every member has a unique identifier. Once a
21 person becomes a member of a community, such as the Los Angeles Metro
22 community, he or she can search that community's database and view profiles
23 posted by other members. Each member has a mailbox; members can send emails
24 to each other within the Matchmaker system. Through the Internet, many
25 thousands of members are able to simultaneously access and use a searchable
26 database maintained on Defendants' computer servers. Indeed, when a member
27
28               3

1   logs into the service, the member is informed of other members in their particular

2   community who are also "on-line" at that time.  This allows members to

3   communicate immediately with each other by email and in "chat rooms," where

4   numerous people can share messages instantaneously.  Matchmaker's servers also

5   are constantly processing database searches by members located around the world.

6   Matchmaker's servers are capable of handling 16,400 transactions per second.

7           The multiple-choice questions for the Los Angles Metro Community

8   include the following:

9           Your current living situation is? Happily married, Not so happily married,

10  Married and we swing, Divorced living alone.

11          What style of dress do you prefer? I like to get dressed up, I like to dress

12  casual, I dress for the occasion, What ever is clean, Preppy, Punk, Nude, Just call

13  me Fred Flintstone.

14          Finally, why did you call? Hoping to start a relationship, Seeking an

15  occasional lover, Hunting for a roommate, Scouting out for swinging couples,

16  Looking for a pen pal only, Just looking/curious, A friend put me up to this,

17  Looking for a one-night stand, I found the number on a bathroom wall, I don't

18  know and I won't call back.

19          Other than the information volunteered by members when they

20  respond to the questionnaire, and the credit card or check information obtained

21  when a member becomes a paying member, Matchmaker does not collect personal

22  information about members.  Nor does Matchmaker verify the information

23  provided by members when they join the service.  Matchmaker does not pre-screen

24  the text answers to its questionnaire of member profiles.  Members are made aware

25  of the possibility that the profiles are created by other members, and some

26  information might be inaccurate or unreliable.  To become a member and gain

27

28                                              4

access to the Matchmaker database for their community, every person must agree to the Matchmaker Disclaimer. As part of its terms and conditions for membership, Matchmaker prohibits the inclusion of the following information (among other things) in a profile: home address, email address, telephone number, offensive sexually suggestive or connotative language. Only when a member becomes a paying member and elects to pay the fee by credit card or check does Matchmaker obtain any personal information, and that information is kept in confidence. Matchmaker does not review the answers to questionnaires before that information is included in the database and made available for searching by members. As soon as a new member completes the questionnaire, the resulting profile is made available on-line to other members of the community. At any time, existing members may call up their own profiles and make changes. These changes also are not reviewed by Matchmaker prior to posting.

Matchmaker reviews all photographs before they are posted on the service. Each community has a system operator who handles member inquiries and complaints. When a member submits photographs for his or her profile, the photographs are routed to the system operator assigned to that member's community. The system operator then reviews the photographs before they are included in the Matchmaker database. The system operator eliminates all photographs that violate Matchmaker's standards. According to Defendants, while photographs can be efficiently and consistently evaluated under objective criteria (such as the ban on nudity in most Matchmaker communities), the monitoring of text would be necessarily subjective and would place Matchmaker in the role of editor, censor and arbiter of good taste. Defendants further contend that evaluation of text also is impractical because of the great number of profiles

1  on the service, and the time that reading and analyzing the essay answers would

2  require.

3           Matchmaker relies on its members to report abuses.  Whenever a

4  member complains about inappropriate content posted by others, the system

5  operator in charge of that community investigates and, if appropriate, edits or

6  removes the offending profile.

7           On October 23, 1999, an unknown person created a trial account

8  under the name "Chase529" on the Los Angeles "metro" community.

9  Matchmaker's records show that the profile ("Profile") was posted and

10 subsequently modified one time by a person using computer terminals in Europe.

11 The Profile included Plaintiff's home address and an email address and four

12 photographs of Plaintiff.  The email address in the Profile prompted the following

13 automatic response:

14           "You think you're the one.

15           Proof it!!

16           [Plaintiff's home address]

17           [Plaintiff's telephone number ]."

18 Matchmaker admits that the home address and email address in the Profile

19 violated its terms and conditions.

20           Plaintiff alleges that other essay answers and the answer to a

21 multiple-choice question falsely characterize her as licentious.  She alleges that the

22 Profile contains a litany of false statements about her, including the following: She

23 contacted Matchmaker because she was "looking for a one-night stand"; she

24 "might be persuaded to have a homosexual experience"; her main source for

25 current events is Playboy/Playgirl; she is interested in meeting someone "hard and

26 dominant in more ways than one.  Must have a strong sexual appetite"; she likes

27

28                                        6

1   "being controlled by a man in and out of bed." Plaintiff also asserts that the

2   Profile disclosed that she lived alone with her son.

3            As a result of the Profile, Plaintiff received obscene telephone

4   messages, a fax letter, email and other correspondence.  Plaintiff and her son were

5   forced to leave their home and to stay in hotels and with friends; they eventually

6   left the Los Angeles area entirely for a period of time.

7            On or about November 4, 1999, Plaintiff learned about the Profile.

8   The next day, Plaintiff reported the matter to police.  Plaintiff did not contact

9   Matchmaker.

10           On or after Saturday, November 6, 1999, Siouxan Perry ("Perry"),

11  who maintains Plaintiff's personal website, learned of the Profile from an email

12  sent to Plaintiff by an individual using the name "Jeff."  Perry discussed the matter

13  with Plaintiff and then contacted Matchmaker by telephone.

14           An exchange of emails between "Jeff" and Perry establishes that the

15  Profile was made inaccessible to Matchmaker members no later than Monday

16  morning, November 8, 1999.  Matchmaker's records show that the Chase 529

17  Profile was purged from its servers at 4:00 a.m. on November 9, 1999.

18           Plaintiff believes that the Chase 529 Profile was posted by an

19  estranged fan, Eike Lange.  However, Lange denied to Plaintiff that he posted the

20  Profile.

21           Plaintiff describes herself as a "successful actress who works in

22  television, motion pictures, and live theater."  She states that she is best known for

23  her "break-out" role on Star Trek: Deep Space Nine, "the number one syndicated

24  television show in the world."  Plaintiff's character was so popular that it was the

25  subject of an action figure and a trading card.  Plaintiff has been the topic of

26  newspaper profiles and magazine articles.  Plaintiff has also made the cover of

27

28                                                7

several magazines including Femme Fatales as one of "Trek's Sexy Fifty."
Plaintiff has taken on other prominent roles on television.  She has appeared on a
recurring role on General Hospital and as the featured guest star in the Emmy
Award-winning episode of ER.  For one year, Plaintiff co-hosted a news magazine
show on the Sci-Fi Channel, and in the last several years she has appeared on the
television programs Sliders and Sci-Fi Vortex.  She also hosted NBC Saturday
Night at the Movies and was a guest on The Montel Williams Show.  Plaintiff also
has appeared in a number of films, and had lead roles in the movies Frozen,
Marina, In a Moment of Passion, Sammyville, Lighting, Digital Man, and Married
People, Single Sex.  Her acting roles included a part in the hit Mel Brooks film,
Robin Hood: Men in Tights.  Plaintiff has made infomercials and television
commercials, including a national TV ad where she played the CEO of Starkist
Tuna.  Plaintiff makes personal appearances at Star Trek conventions throughout
the world, and joins fans on Star-Trek cruises.  These appearances, which can
draw as many as 5,000 people, involve speeches, autograph signings, dinners and
mixing with fans.  Plaintiff does not make official appearances at all of the
conventions that she does attend; she sometimes attends such events without being
paid.  Plaintiff recently used a convention appearance to launch her singing career.
Other public appearances by Plaintiff include hosting the "Sexiest Geek Alive"
contest and charity walkathons.  The "Sexiest Geek" event was the subject of
national news reports and was a job that Plaintiff actively sought and hoped to turn
into a television show.  Plaintiff reports that her stage name was the answer to a
question on the game show, Jeopardy.  Managers and agents have been retained by
Plaintiff in Hollywood and New York to advance her career as an entertainer.
Plaintiff also promotes herself and her career on the Internet through a personal
website, chasemasterson.com, which details Plaintiff's achievements, touts her

upcoming appearances and activities, and provides contact information for her manager. This personal website generates 200,000 to 300,000 "hits" by visitors each month. Plaintiff has "a worldwide following" and "her fan club has had a presence in eleven different countries." Plaintiff boasts that "[a]t one point I had the largest fan club in Star Trek fandom of anyone, past or present actors on the show." Plaintiff's fan club maintains a website and publishes a newsletter - both of which offer news and messages from Plaintiff. The fan club website gets about 3,000 "hits" from visitors each month. Even the filing of this lawsuit gained international media attention. In addition to speaking at Star Trek conventions, were she can reach thousands of people at a single engagement, Plaintiff has the ability to control the content in her fanclub's newsletter and in her own website. Plaintiff maintains her own website, the content of which is entirely her choice. She has retained a "webmistress," who maintains the site and handles Plaintiff email traffic. Plaintiff has used her influence with the fan club to promote organizations like Caring for Babies with AIDS. At one point, Plaintiff's fan club was "one of their highest private contributions."

Plaintiff has discussed her son at public events and in interviews, and her status as a single parent was certainly known by the hundreds of fans who have joined Plaintiff and her son on Star Trek cruises.

Recently, Plaintiff's personal website was simultaneously promoting Plaintiff's career and soliciting charitable giving for victims of the September, 2001 terrorist attack. Plaintiff is currently is advertising her new album of torch songs on her website.

In February 2000, an article appeared on the Internet describing an alleged suicide attempt by Plaintiff, which was originally reported in an Australian

magazine. A member of Plaintiff's fan club in Australia posted information obtained from Plaintiff on the web regarding this report.

## B.   Procedural Summary

On October 27, 2000, Plaintiff filed her Complaint in the Superior Court of the State of California for the County of Los Angeles.

On December 21, 2000, Plaintiff filed a Request for Dismissal in the Superior Court, dismissing Defendant Bradley R. Tyer.

On January 2, 2001, Defendants Metrosplash.com, Inc. and Lycos, Inc. filed a Notice of Removal of Action based on diversity. The action was assigned to Judge King.

On January 9, 2001, Defendants filed a Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6).

On January 9, 2001, the action was reassigned to Judge Moreno.

On February 8, 2001, the Court entered an Order Denying Defendants' Motion to Dismiss.

On February 23, 2001, Defendants filed an Answer to Complaint.

On May 7, 2001, the Court held a Scheduling Conference.

On June 25, 2001, a Confidentiality Agreement and Order was filed.

On October 25, 2001, the case was reassigned to Judge Snyder.

On November 19, 2001, the case was reassigned to this Court.

On November 30, 2001, this Court issued a Notice to Counsel, wherein this Court vacated and set aside all previous dates.

On January 14, 2002, this Court held the Scheduling Conference and set the following dates: motion cutoff on February 14, 2002, pretrial conference on March 18, 2002 and trial on April 30, 2002.

1    On January 30, 2002, Defendants filed a Motion for Summary

2    Judgment, which is currently before this Court.

3    **II.    Discussion**

4        **A.    Standard**

5        Under the Federal Rules of Civil Procedure, summary judgment is

6    proper only where "the pleadings, depositions, answers to interrogatories, and

7    admissions on file, together with the affidavits, if any, show that there is no

8    genuine issue as to any material fact and that the moving party is entitled to a

9    judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the

10   burden of demonstrating the absence of a genuine issue of fact for trial. See

11   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).

12   If the moving party satisfies the burden, the party opposing the motion must set

13   forth specific facts showing that there remains a genuine issue for trial. See id.;

14   Fed. R. Civ. P. 56(e).

15       A non-moving party who bears the burden of proof at trial to an

16   element essential to its case must make a showing sufficient to establish a genuine

17   dispute of fact with respect to the existence of that element of the case or be

18   subject to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322,

19   106 S. Ct. 2548, 2552 (1986). Such an issue of fact is a genuine issue if it

20   reasonably can be resolved in favor of either party. See Anderson, 477 U.S. at

21   250-51, 106 S. Ct. at 2511. The non-movant's burden to demonstrate a genuine

22   issue of material fact increases when the factual context renders her claim

23   implausible. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475

24   U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). Thus, mere disagreement or the bald

25   assertion that a genuine issue of material fact exists no longer precludes the use of

26   summary judgment. See Harper v. Wallingford, 877 F.2d 728 (9th Cir. 1989);

27

28                                11

California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

Unauthenticated documents cannot be considered on a motion for summary judgment. See Hal Roach Studios v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990).

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. See Fed. R. Civ. P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

**B.    Analysis**

**1.    The Communications Decency Act of 1996 does not bar Plaintiff's causes of action**

Defendants contend that all of Plaintiff's causes of action are barred by the Communications Decency Act of 1996 ("CDA").

Section 230 of the CDA creates a federal immunity to any cause of action that would make computer service providers liable for information originating with a third-party user of the service. It provides as follows:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

12

1  47 U.S.C. § 230(c)(1).  The CDA defines an "interactive computer service" as:

2          [A]ny information service, system, or access software

3          provider that provides or enables computer access by

4          multiple users to a computer server, including

5          specifically a service or system that provides access to

6          the Internet and such systems operated or services

7          offered by libraries or educational institutions.

8  Id. at § 230(f)(2).  Thus, claims seeking to hold a service provider liable for its

9  exercise of a publisher's traditional editorial functions - such as deciding whether

10  to publish, withdraw, postpone or alter content - are barred.

11          Congress promulgated the CDA in recognition of "the threat that tort-

12  based lawsuits pose to freedom of speech in the new and burgeoning Internet

13  medium."  Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).  The

14  CDA states that part of its policy is:

15          (1) to promote the continued development of the internet

16          and other interactive computer services and other

17          interactive media;

18          (2) to preserve the vibrant and competitive free market

19          that presently exists for the Internet and other interactive

20          computer services, unfettered by Federal or State

21          regulation; . . . .

22  Id. at § 230(b).  While Congress made clear that the party who posts defamatory

23  messages would not escape accountability, it "made a policy choice, . . ., not to

24  deter harmful online speech through the separate route of imposing tort liability on

25  companies that serve as intermediaries for other parties' potentially injurious

26  messages."  Zeran, 129 F.3d at 331.

27

28                    13

1    Section 230 of the CDA also responded to a New York state court

2  decision, <u>Stratton Oakmont, Inc. v. Prodigy Servs. Co.</u>, 1995 WL 323710 (N.Y.

3  Sup. Ct. 1995), in which Prodigy was found liable as a publisher of false

4  information posted by a third party on Prodigy's "financial computer bulletin

5  board." It found Prodigy liable as a publisher because it edited content "on the

6  basis of offensiveness and 'bad taste.'" <u>See id.</u> at *4. The court made clear that

7  the outcome would have been different if Prodigy had merely made third-party

8  content available to subscribers without alteration and had not taken "the role of

9  determining what is proper for its members to post and read on its bulletin

10  boards." <u>Id.</u> Section 230 of the CDA removes the disincentives to self-regulation

11  created by the <u>Stratton Oakmont</u> decision. The enactment of this statute removes

12  "disincentives for the development and utilization of blocking and filtering

13  technologies that empower parents to restrict their children's access to

14  objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4).

15    Thus, the question becomes whether Matchmaker is an "interactive

16  computer service" provider so as to be immune from liability under Section 230 of

17  the CDA.

18    **a.    Matchmaker is an "interactive computer service"**

19    As set forth above, the CDA defines an "interactive computer

20  service" as:

21    [A]ny information service, system, or access software

22    provider that provides or enables computer access by

23    multiple users to a computer server, including

24    specifically a service or system that provides access to

25    the Internet and such systems operated or services

26    offered by libraries or educational institutions.

27

28                                   14

Id. at § 230(f)(2). This Court agrees with Defendants that Matchmaker qualifies as an interactive computer service provider. Matchmaker is an information service "that provides or enables computer access by multiple users to a computer server." Through the Internet, many thousands of members are able to access and use a searchable database maintained on Defendants' computer servers.

Plaintiff argues that Matchmaker is not an interactive computer service. Specifically, she argues that Matchmaker neither provides nor enables computer access to the Internet.[3] However, the plain language of the statute does not contain this requirement. Rather, it <u>includes</u> as a specific example "a service or system that provides access to the Internet." As such, internet service providers (ISPs) are only a subclass of the broader definition of interactive service providers. Plaintiff further argues that "in the vast majority of the cases cited by defendants, the defendant was an Internet service provider, American Online ("AOL"), that clearly falls within the definition of "interactive computer service." This Court agrees that in most cases addressing this issue, AOL was the defendant, and AOL undisputedly qualifies as a provider of interactive computer services. However, both parties acknowledge two cases in which the court found that a web site operator, like Matchmaker, qualified as an interactive computer service provider even though it did not enable access to the Internet.

In <u>Schneider v. Amazon.Com, Inc.</u>, 31 P.3d 37 (Wash. Ct. App. 2001), defendant Amazon.com, which operates a website with a searchable

---

[3] This Court notes that in his Order Denying Defendants' Motion to Dismiss, Judge Moreno found that Matchmaker is not an internet service provider, and that therefore, the Section 230 defense does not immunize Defendants from liability. However, this finding, which this Court disagrees with for the reasons set forth herein, was made upon a motion to dismiss wherein the Court cannot consider evidence outside of the pleadings and must accept all material allegations in the complaint as true.

1  database where people can look for and purchase books, posts reviews of books by

2  readers.  When negative comments about an author were posted, the author sued

3  Amazon for defamation and contended that the CDA's immunity only applied to

4  ISPs.  See id. at 39.  The Washington Court of Appeal rejected these arguments,

5  finding that "Amazon's web site enables visitors to the site to comment about

6  authors and their work, thus providing an information service that necessarily

7  enables access by multiple users to a server.  This brings Amazon squarely within

8  the definition." Id. at 40.  Similarly, in Stoner v. eBay, Inc., 2000 WL 1705637 at

9  *1 (Cal. Super. 2000), eBay's status as an interactive computer service provider

10  was not disputed, and eBay is a web site operator which does not enable access to

11  the Internet.

12           Thus, in sum, this Court concludes that Matchmaker is a website

13  operator that qualifies as a provider of an interactive computer service under

14  Section 230 of the CDA.  The next question, then, is whether Matchmaker is

15  considered an information content provider.

16           **b.     Matchmaker is an "information content provider"**

17           Section 230 immunity applies only when the content is not provided

18  by the service entity:

19                    No provider or user of an interactive computer service

20                    shall be treated as the publisher or speaker of any

21                    information provided by another information content

22                    provider.

23  47 U.S.C. § 230(c)(1).  An information content provider is:

24                    [A]ny person or entity that is responsible, in whole or in

25                    part, for the creation or development of information

26

27

28                                        16

1           provided through the Internet or any other interactive

2           computer service.

3    Id. at § 230(f)(3).

4           Plaintiff argues that Matchmaker is such an "information content

5    provider." Specifically, she asserts that the questionnaire used to create the Profile

6    was carefully fashioned specifically for the "Los Angeles Metro Community" to

7    include what Defendants determined to be appropriate questions and suitable

8    responses - many of which were sexually charged - for that community.

9           This Court agrees that Matchmaker qualifies an information content

10   provider. The users of the Matchmaker website do not simply post whatever

11   information they desire. Rather, a profile for each user is created from the

12   questions asked by Matchmaker and the answers provided. These questions

13   consist of multiple choice questions and essay questions. By conducting its

14   service, Matchmaker does not just provide a site for people to post whatever

15   information they choose. Rather, it provides 62 multiple-choice questions and a

16   series of essay questions tailored for each Matchmaker community. Thus,

17   Matchmaker is an "entity that is responsible, . . . in part, for the creation or

18   development of information provided through the Internet or any other interactive

19   computer service."

20          Defendants argue that the Matchmaker service functions just like a

21   bulletin board or any other type of on-line forum for speech. However,

22   Defendants' argument ignores an important difference between Matchmaker and a

23   bulletin board. Specifically, as stated above, Matchmaker contributes to the

24   content of the profiles by asking specific questions with multiple choice answers

25   and specific essay questions. It is responsible, in part, "for the creation or

26   development of information" contained in the profiles. Indeed, it appears that a

27

28                                   17

1  member cannot post any other additional information even if he/she desires.  By

2  contrast, a bulletin board and the other types of on-line forums designated by

3  Defendants merely provide the forums for the speech and do not contribute to the

4  creation or development of information provided by the users of these services.

5  This Court's determination would be different if Matchmaker simply acts as a

6  conduit of the information, but it does not.  Matchmaker takes an active role in

7  developing the information that gets posted.

8          Defendants further argue that there is simply no authority for the

9  proposition that providing a public forum for speech, or asking non-defamatory

10  questions, creates liability for the speech of others.  Defendants, however, phrase

11  the issue inaccurately in an attempt to ignore the plain language of the CDA.  The

12  issue is whether the CDA provides immunity for Matchmaker, as a provider of an

13  interactive computer service, when Matchmaker is also an information content

14  provider.  Defendants are correct that such a determination requires this Court to

15  decide when content provided by third parties is somehow transformed into

16  content created by an interactive computer service.  Indeed, the very nature of this

17  inquiry requires this Court to make this determination because of the specific

18  wording of the statute.  Other courts recognize that this distinction needs to be

19  made as well.  In Schneider v. Amazon.Com, Inc., supra, the court determined that

20  Amazon.com was a provider or user of interactive computer services.  It then

21  proceeded to determine whether Amazon.com was an information content

22  provider.  See id. at 465.  The plaintiff argued that because Amazon.com had the

23  right to edit the posting and because Amazon.com claimed licensing rights in the

24  posted material, Amazon.com in effect became the content provider.  See id.  The

25  court disagreed and found, based on prior case law, that the mere right to edit and

26  the licensing rights did not exempt Amazon.com from the scope of protection

27

28                                                          18

granted by Section 230.  See id. at 466-67.  Importantly, the court drew a distinction between the plaintiff's arguments and arguments that "Amazon was responsible for creating or developing the negative comments," implying that its determination would be different had Amazon contributed to the creation or development of the material.  Id. at 467.

Similarly, in Blumenthal v. Drudge, 992 F. Supp. 44 (D.D.C. 1998), the court examined the plaintiff's arguments that AOL was an information content provider.  It found that plaintiff provided no factual support for the assertion that AOL was responsible along with the author of the alleged defamatory material because it had some role in writing or editing the material.  See id. at 50.  However, the court stated:

> AOL acknowledges both that Section 230(c)(1) would
> not immunize AOL with respect to any information AOL
> developed or created entirely by itself and that there are
> situations in which there may be two or more
> information content providers responsible for material
> disseminated on the Internet - joint authors, a lyricist and
> a composer, for example. . . . While Section 230 does
> not preclude joint liability for the joint development of
> content, AOL maintains that there simply is no evidence
> here that AOL had any role in creating or developing any
> of the information in the Drudge Report.  The Court
> agrees.  It is undisputed that the Blumenthal story was
> written by Drudge without any substantive or editorial
> involvement by AOL. . . .  AOL was nothing more than

1           a provider of an interactive computer service on which

2           the Drudge Report was carried . . . .

3    Id.  Again, this Court found that joint liability would be possible if AOL "had any

4    role in creating or developing any of the information" in the posted material.

5           Thus, in sum, the language of the statute itself requires this Court to

6    determine whether Matchmaker, as a provider of an interactive computer service,

7    is an information content provider, i.e., is partly responsible for the creation or

8    development of the information being provided.  This Court concludes that

9    Matchmaker is such an information content provider.  Consequently, the immunity

10   of Section 230 does not extend to it as a matter of law, and Defendants are not

11   entitled to summary judgment on this basis.

12        **2.     Defendants are entitled to summary judgment with respect**

13                **to Plaintiff's cause of action for invasion of privacy**

14          In her first cause of action, Plaintiff alleges that Defendants invaded

15   her right to privacy by posting the Profile on Matchmaker.  Specifically, she

16   alleges that the publicity created by Defendants constituted a public disclosure of

17   private facts as to Plaintiff's home address.[4]  Defendants argue that summary

18   judgment is warranted as to this cause of action because Plaintiff cannot meet the

19   requirements for a private facts claim.

20          The private facts claim requires "(1) public disclosure (2) of a private

21   fact (3) which would be offensive and objectionable to the reasonable person and

22   (4) which is not of legitimate public interest."  Shulman v. Group W Productions,

23   Inc., 18 Cal. 4th 200, 214 (1998).  The fourth element, which is often referred to as

24   _____

25          [4] Plaintiff also originally alleged that Defendants tortiously disclosed the
     private facts of her telephone number and that she lived alone with her son;
26   however, it appears from the papers submitted that Plaintiff has abandoned her
     claim with respect to these facts.
27

28                                    20

1 | lack of "newsworthiness" is a constitutional hurdle that requires the plaintiff to

2 | prove that the disclosed facts are not of legitimate public interest. See id. at 214-

3 | 16.

4 |       Defendants argue that (1) the disclosure of Plaintiff's home address

5 | was not "offensive" to the reasonable person; (2) Plaintiff's celebrity status made

6 | the disclosure newsworthy; and (3) Defendants did not act with reckless disregard

7 | when publishing Plaintiff's address. Because this Court agrees with the second

8 | and third arguments, it does not address Defendants' first argument.[5]

9 |       "It is well settled that even where the three elements for a cause of

10 | action for invasion of privacy are met, publication of the information may still be

11 | exempt from liability if it is truthful and newsworthy." Times-Mirror Co. v.

12 | Superior Court, 198 Cal. App. 3d 1420, 1428, 244 Cal. Rptr. 556 (1988). In

13 | determining whether the information is newsworthy, a court considers: (1) the

14 | social value of the published facts, (2) the extent of the intrusion into ostensibly

15 | private matters, and (3) the extent to which a party voluntarily assumed a position

16 | of public notoriety. See id.

17 |       In considering the above factors, this Court concludes that the

18 | publication of Plaintiff's address was newsworthy. First, the social value of

19 | Plaintiff's address can be inferred from the myriad tours and maps offered of

20 | "Star's Homes" throughout Los Angeles County. Second, the intrusion here is

21 | minimal given the fact that Plaintiff's address is not a "private matter" but rather is

22 |

23 |      [5] This Court also acknowledges the fact that Judge Moreno, in his Order
Denying Defendants' Motion to Dismiss, found that "disclosing . . . Plaintiff's

24 | address constitute[s] tortious disclosure of private facts." (See Order, p. 8.) Thus,
to avoid any inconsistent findings, even though Judge Moreno's determination

25 | was not made on a complete record but on a motion to dismiss, this Court

26 | proceeds to Defendants' last two arguments which were not addressed by Judge

27 | Moreno's order.

28 |                               21

1   a matter of public record.  (See Alger Supp. Decl., ¶ 15, Exh. 6.)  As the California

2   Supreme Court stated:

3              If the information reported has previously become part of

4              the 'public domain' or the intrusion into an individual's

5              private life is only slight, publication will be privileged

6              even though the social utility of the publication may be

7              minimal.  [Citations.]

8   Kapellas v. Kofman, 1 Cal. 3d 20, 36 (1969); see also Cox Broadcasting Co. v.

9   Cohn, 420 U.S. 469, 494-96, 95 S.Ct. 1029, 43 L. Ed. 2d 328 (1975) (no privacy

10  claim can be based on a fact open to public inspection in government records; "We

11  are reluctant to embark on a course that would make public records generally

12  available to the media but forbid their publication if offensive to the sensibilities

13  of the supposed reasonable man.").  Finally, there can be no doubt that Plaintiff

14  voluntarily assumed a position of public notoriety by becoming an entertainment

15  celebrity.  Plaintiff describes herself as "an actress who a lot of people would like

16  to know" (see Carafano Depo., p. 176), with fans who want to know details about

17  her life (see id. at 224.)  It is undisputed that Plaintiff's activities as a celebrity

18  included public discussion of her home life and the entertaining of fans who visit

19  her in Los Angeles.  Thus, because this Court concludes that the publication of

20  Plaintiff's home address is newsworthy, Plaintiff's claim for invasion of privacy

21  fails as a matter of law.

22              Furthermore, this Court concludes that there is no evidence that

23  Defendants acted with reckless disregard when publishing Plaintiff's home

24  address.  The California Supreme Court held that a plaintiff cannot prevail on a

25  claim for public disclosure of private facts without establishing that the defendant

26  published the information "with reckless disregard for the fact that reasonable men

27

28                                              22

1  would find the invasion highly offensive." Briscoe v. Reader's Digest
2  Association, Inc., 4 Cal. 3d 529, 543 (1971).  Here, the undisputed evidence shows
3  that Defendants were unaware of the contents of the Profile when it was posted.
4  Plaintiff argues that whether Defendants acted with reckless disregard is a
5  question of fact because Defendants failed to pre-screen the text of profiles even
6  though they received several complaints about other false profiles and prohibited
7  publication of home addresses.  However, "failure to investigate before
8  publishing, even when a reasonably prudent person would have done so, is not
9  sufficient to establish reckless disregard." Harte-Hanks Communications, Inc. v.
10  Connaughton, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 l. Ed. 2d 562 (1989).

11          In light of the above, because this Court concludes that Defendants
12  have established that the disclosure of Plaintiff's home address was newsworthy
13  and that Plaintiff cannot show a triable issue with respect to whether the disclosure
14  of Plaintiff's home address was made with reckless disregard, Defendants are
15  entitled to summary judgment with respect to Plaintiff's cause of action for public
16  disclosure of private facts.  Absent the element of Plaintiff's celebrity status and
17  the undisputed fact that Plaintiff is a public figure, this Court would be of the
18  opinion that there might be a triable issue of fact with respect to the element of
19  "reckless disregard" in that Defendants violated the express terms and conditions
20  of its membership agreement by disclosing the Plaintiff's home address and email
21  address in the Profile.

22          **3.    Defendants are entitled to summary judgment with respect**
23               **to Plaintiff's cause of action for defamation**

24          In her third cause of action, Plaintiff alleges that Defendants
25  published the Profile which contained false and defamatory statements about
26  Plaintiff concerning her alleged sexual behavior and preferences.  Defendants seek

27

28                                    23

1  summary judgment with respect to this cause of action and contend that Plaintiff

2  cannot establish that Defendants acted with constitutionally required actual

3  malice.

4                     **a.    Plaintiff is a public figure**

5                 Public figures are entitled to less protection against defamation and

6  invasion of privacy than are private figures with respect to the publication of false

7  information about them.  See Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94

8  S.Ct. 2997, 3008, 41 L. Ed. 2d 789 (1974).  A private figure only needs to prove

9  that a defendant acted negligently in publishing false information about the

10  individual, while a public figure must prove by clear and convincing evidence that

11  the publication was motivated by actual malice.  See id. at 345-46.  The distinction

12  between "public figures" and "private figures" was established by the United

13  States Supreme Court in Gertz.  The determination of whether Plaintiff is a public

14  figure is a question of law.  Rosenblatt v. Baer, 383 U.S. 75, 88 n.15, 86 S.Ct. 669,

15  677 n. 15 (1966).

16                 The public figure distinction is broken down into two categories -

17  general purpose public figures and limited public figures.  See Gertz, 418 U.S. at

18  351.  A limited public figure refers to an individual who voluntarily injects himself

19  or is drawn into a particular public controversy and thereby becomes a public

20  figure for a limited range of issues.  See id.  A general purpose public figure refers

21  to an individual who has achieved such pervasive fame or notoriety that he

22  becomes a public figure for all purposes and in all contexts.  See id.

23                 Because this Court concludes that Plaintiff is a general purpose public

24  figure, it does not examine whether Plaintiff is a limited public figure.  Courts

25  often have found that there is a public interest which attaches to people who by

26  their professional calling, such as actors, create a legitimate and widespread

27

28                                      24

1  attention to their activities.  Thus, the actions of such public figures may

2  legitimately be mentioned and discussed in print or on radio or television.  As has

3  been stated: "A person may, by his own activities or by the force of circumstances,

4  become a public personage and thereby relinquish a part of his right of privacy to

5  the extent that the public has a legitimate interest in his doings, affairs, or

6  character." Werner v. Times-Mirror Co. 193 Cal. App. 2d 111, 117, 14 Cal. Rptr.

7  208 (1961).  While Plaintiff argues that she has not achieved such pervasive fame

8  or notoriety in society to make her a public figure for all purposes and in all

9  contexts, this Court disagrees.  Based on the undisputed facts, Plaintiff is a public

10 figure.

11         Plaintiff describes herself as a "successful actress who works in

12 television, motion pictures, and live theater."  She states that she is best known for

13 her "break-out" role on Star Trek: Deep Space Nine, "the number one syndicated

14 television show in the world."  Plaintiff's character was so popular that it was the

15 subject of an action figure and a trading card.  Plaintiff has been the topic of

16 newspaper profiles and magazine articles.  Plaintiff has also made the cover of

17 several magazines including Femme Fatales as one of "Trek's Sexy Fifty."

18 Plaintiff has taken on other prominent roles on television.  She has appeared on a

19 recurring role on General Hospital and as the featured guest star in the Emmy

20 Award-winning episode of ER.  For one year, Plaintiff co-hosted a news magazine

21 show on the Sci-Fi Channel, and in the last several years she has appeared on the

22 television programs Sliders and Sci-Fi Vortex.  She also hosted NBC Saturday

23 Night at the Movies and was a guest on The Montel Williams Show.  Plaintiff also

24 has appeared in a number of films, and had lead roles in the movies Frozen,

25 Marina, In a Moment of Passion, Sammyville, Lighting, Digital Man, and Married

26 People, Single Sex.  Her acting roles included a part in the hit Mel Brooks film,

27

28                                     25

Robin Hood: Men in Tights.  Plaintiff has made infomercials and television
commercials, including a national TV ad where she played the CEO of Starkist
Tuna.  Plaintiff makes personal appearances at Star Trek conventions throughout
the world, and joins fans on Star-Trek cruises.  These appearances, which can
draw as many as 5,000 people, involve speeches, autograph signings, dinners and
mixing with fans, although Plaintiff does not make official appearances at all of
the conventions that she does attend.  Plaintiff sometimes attends such events
without being paid.  Plaintiff recently used a convention appearance to launch her
singing career.  Other public appearances by Plaintiff include hosting the "Sexiest
Geek Alive" contest and charity walkathons.  The "Sexiest Geek" event was the
subject of national news reports and was a job that Plaintiff actively sought and
hoped to turn into a television show.  Plaintiff reports that her stage name was the
answer to a question on the game show, Jeopardy.  Managers and agents have
been retained by Plaintiff in Hollywood and New York to advance her career as an
entertainer.  Plaintiff also promotes herself and her career on the Internet through a
personal website, chasemasterson.com, which details Plaintiff's achievements,
touts her upcoming appearances and activities, and provides contact information
for her manager.  Plaintiff has "a worldwide following" and "her fan club has had
a presence in eleven different countries."  Plaintiff boasts that "[a]t one point I had
the largest fan club in Star Trek fandom of anyone, past or present actors on the
show."  Plaintiff's fan club maintains a website and publishes a newsletter - both
of which offer news and messages from Plaintiff.  The fan club website gets about
3,000 "hits" from visitors each month.  Even the filing of this lawsuit gained
international media attention.  In addition to speaking at Star Trek conventions,
were she can reach thousands of people at a single engagement, Plaintiff has the
ability to control the content in her fanclub's newsletter and in her own website.

Plaintiff maintains her own website, the content of which is entirely her choice. She has retained a "webmistress," who maintains the site and handles email traffic. Plaintiff has used her influence with the fan club to promote organizations like Caring for Babies with AIDS. At one point, Plaintiff's fan club was "one of their highest private contributions."

This Court notes that it is further persuaded by case law which support the notion that actors and entertainers are public figures. See, e.g., Carlisle v. Fawcett Publications, Inc. 201 Cal. App. 2d 733, 746-47, 20 Cal. Rptr. 405 (1962) (labeling as "public figures" actors and actresses, professional athletes, public officers, noted inventors, explorers and war heroes); Douglass v. Hustler Magazine, Inc., 769 F.2d 1128, 1141 (7th Cir. 1985) ("Entertainers can therefore be public figures for purposes of a publisher's . . . First Amendment defense to a charge of false-light invasion of privacy."); Man v. Warner Bros., Inc., 317 F. Supp. 50 (S.D.N.Y. 1970) (referring to plaintiff's "frivolous" contention that an entertainer, performing on a stage before 400,000 people, is not a public figure). This Court concludes that the evidence set forth above and on record with this Court clearly establish that Plaintiff is a public figure.

**b.    Plaintiff has failed to establish a genuine issue of fact that Defendants acted with actual malice**

Defendants argue that there is no evidence, let alone "clear and convincing" evidence, that Defendants acted with actual malice in publishing the Profile.

The Supreme Court established the constitutional rule that a public figure cannot recover damages for defamation without clear and convincing proof that a false "statement was made with 'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York

27

Times Co. v. Sullivan, 376 U.S. 254, 279-80; 84 S.Ct. 710, 726, 11 L. Ed. 2d 789
(1974). The burden is on the plaintiff to affirmatively establish by clear and
convincing evidence that a genuine issue of fact exists as to whether actual malice
can be proven at trial. See Aisenson v. ABC, Inc. 220 Cal. App. 3d 146, 154, 269
Cal. Rptr. 379 (1990). As stated in Aisenson:

> Reckless conduct is not measured by whether a
> reasonably prudent man would have published, or would
> have investigated before publishing. There must be
> sufficient evidence to permit the conclusion that the
> defendant in fact entertained serious doubts as to the
> truth of his publication. Publishing with such doubts
> shows reckless disregard for truth or falsity and
> demonstrates actual malice.

See id. at 160; St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325,
20 L. Ed. 2d 262 (1968). "The question of whether the evidence in the record . . .
is sufficient to support a finding of actual malice is a question of law." Harte-
Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 658, 109 S.Ct. 2678,
105 L. Ed. 2d 562 (1989).

Plaintiff argues that Defendants should have entertained serious doubt
as to the truth of the Profile. She relies on the reply email which she claims was
sent to Matchmaker in response to Matchmaker's confirmation email.[6] She states

_____

[6] As set forth in the factual summary, upon complete of a membership
application, Matchmaker sends an automatic "welcome email" to the email address
provided by the new member. With respect to the Profile at issue, the email
address in the Profile prompted the following automatic response: "You think
you're the one. Proof it!! [Plaintiff's home address] [Plaintiff's telephone
number]."

1  that this automatic reply email amounted to an invitation to have sex, accompanied

2  by Plaintiff's home address and telephone number.  She further argues that

3  Defendants had a high degree of awareness of the Profile's probable falsity when

4  Plaintiff's assistant demanded that the Profile be removed.

5         This Court concludes as a matter of law that Plaintiff has failed to

6  show evidence, much less clear and convincing evidence, from which a jury could

7  find actual malice.  First, as Defendants argue, Plaintiff provides no evidence that

8  Matchmaker ever received the reply email in response to its welcome confirmation

9  email.  Second, even if Matchmaker received the response, such evidence does not

10  meet the First Amendment's requirement that Defendants harbored actual malice

11  at the time of the publication.  See Bose Corp. v. Consumers Union, 466 U.S. 485,

12  513, 104 S.Ct. 1949, 80 L. Ed. 2d 502 (1984) (affirming reversal of bench trial

13  verdict in favor of plaintiff where plaintiff failed to present clear and convincing

14  evidence that author realized the inaccuracy at the time of publication); accord

15  Schoen v. Schoen, 48 F.3d 412, 417 (9th Cir. 1995) (evidence of ill will after the

16  making of the false statements is insufficient proof of constitutional actual

17  malice).  For this same reason, Plaintiff's argument that Defendants were aware of

18  the Profile's probable falsity when Plaintiff's assistant demanded that the Profile

19  be removed fails.  Third, Plaintiff fails to address the proper showing for actual

20  malice.  She argues that Defendants "should have entertained serious doubt as to

21  the truth of the Profile."  However, it is well-established that:

22         Reckless disregard for the truth 'is not measured by

23         whether a reasonably prudent man would have

24         published, or would have investigated before publishing.

25         There must be sufficient evidence to permit the

26         conclusion that the defendant in fact entertained serious

27

28                                    29

1        doubts as to the truth of his publication.' Lack of due

2        care is not the measure of liability, nor is gross or even

3        extreme negligence.

4   <u>McCoy v. Hearst Corp.</u>, 42 Cal. 3d 835, 860 (1986) (quoting <u>St. Amant v.</u>

5   <u>Thompson</u>, 390 U.S. 727, 731 (1968)).  Finally, the evidence on the record shows

6   that Matchmaker does not review the text of profiles before they are posted by

7   members on its database. (<u>See</u> Simpson Decl., ¶ 19.)  As a result, Defendants

8   could not have had any knowledge that the Profile was false or a high degree of

9   awareness the Profile was probably false when it was posted.

10      In sum, Plaintiff, as a public figure, must establish by clear and

11   convincing evidence that a genuine issue of fact exists as to whether actual malice

12   can be proven at trial.  Plaintiff has failed to do so.  Consequently, Defendants are

13   entitled to summary judgment with respect to the defamation cause of action.

14        **c.**   **Defendants did not act as distributors**

15      Defendants further argue that because Matchmaker acted as a

16   distributor and had no reason to know that the profile was false, they cannot be

17   held liable for defamation.  While this Court notes that it does not need to reach

18   this further argument based on its determination, above, this Court briefly

19   addresses Defendants' argument.

20      A distributor of defamatory matter is blameless if the distributor has

21   had no notice of its possible falsity.  <u>See</u> Restatement (Second) Torts § 581 ("one

22   who only delivers or transmits defamatory matter published by a third person is

23   subject to liability if, but only if, he knows or has reason to know of its defamatory

24   character").  "This rule protects libraries and vendors of books, magazines and

25   newspapers."  <u>Osmond v. EWAP, Inc.</u>, 153 Cal. App. 3d 842, 853, 200 Cal. Rptr.

26   674 (1984).  The rationale is that one who merely plays a secondary role in

27

28                30

1   disseminating information published by another may avoid liability by showing

2   there was no reason to believe it to be a libel.  See id. at 852.

3           This Court agrees with Plaintiff and concludes that Defendants are

4   not merely distributors of the Profile.  Defendants attempt to hold Matchmaker out

5   as an "electronic library" and assert that just as a traditional library cannot be held

6   liable for defamatory matter contained in a book that it makes available to the

7   public, Matchmaker is not liable for the content of profiles posted by its members.

8   However, this statement is contrary to the evidence and to this Court's discussion,

9   above, with respect to immunity under the CDA.  Defendants created and tailored

10  membership questionnaires that served as the basis for the Profile.  Every answer

11  made in response to the questionnaires becomes part of the Profile.  As such,

12  Matchmaker is more than just a passive conduit of information.  This is what

13  distinguishes this case from the case relied on by Defendants, Cubby, Inc. v.

14  Compuserve Inc., 776 F. Supp. 135 (S.D.N.Y. 1991), wherein the court found that

15  Compuserve, which provided its subscribers with access to an electronic library of

16  new publications put together by an independent third party and loaded onto the

17  company's computer banks, was a mere "distributor" of information and could not

18  be held liable for defamatory statements made in the news publications.  Unlike

19  here, the evidence in Cubby was that Compuserve had no editorial control over the

20  publication at issue.  See id. at 140 ("CompuServe has no more editorial control

21  over such a publication than does a public library, book store, or newsstand, and it

22  would be no more feasible for CompuServe to examine every publication it carries

23  for potentially defamatory statements than it would be for any other distributor to

24  do so.").  As such, Defendants cannot avail themselves of the limited distributor's

25  liability.

26

27

28                                          31

1   **4.   Defendants are entitled to summary judgment with respect**

2   **to Plaintiff's cause of action for misappropriation of right**

3   **of publicity**

4   In her second cause of action, Plaintiff alleges that the use of her

5   photographs in the Profile constitute an appropriation of her likeness. Defendants

6   seek summary judgment with respect to this cause of action arguing that Plaintiff

7   cannot show that Defendants acted with the requisite constitutional actual malice.

8   This Court agrees with Defendants that because Plaintiff cannot establish a triable

9   issue with respect to actual malice, as explained above, Plaintiff cannot sustain her

10  claim for misappropriation of the right to publicity. See Hoffman v. Capital

11  Cities/ABC, Inc., 255 F.3d 1180, 1187 (9th Cir. 2001).

12  Plaintiff responds that the actual malice standard does not apply to

13  Plaintiff's claim because the Profile constituted commercial speech. "When

14  speech is properly classified as commercial, a public figure plaintiff does not have

15  to show that the speaker acted with actual malice." Id. at 1185. The question,

16  then, is whether the Profile constitutes commercial speech. The "core notion of

17  commercial speech" is that it "does no more than propose a commercial

18  transaction." Id. at 1184 (citing Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60,

19  66 (1983)).

20  In support of her argument that the Profile constitutes commercial

21  speech, Plaintiff asserts that Matchmaker's business is dependent on enticing free

22  trial members to become paying members through access to profiles for a certain

23  period, and that Matchmaker must sell memberships to customers to stay in

24  business. This Court finds Plaintiff's argument to be without merit. The fact that

25  Matchmaker makes a profit from selling memberships does not transform the

26  speech at issue into commercial speech. See id. at 1186 (defendant's goal of

27

28                                          32

1  gaining a profit from magazine sales or "rev[ing] up" the magazine's profile did

2  not make fashion article "commercial").  Plaintiff attempts to compare

3  Matchmaker's use of the Profile with the unauthorized use of Hawaiian surfer

4  photographs in a store's catalog in Downing v. Abercrombie & Fitch, 265 F.3d

5  994 (9th Cir. 2001).  This Court finds no comparison.  The use of the Hawaiian

6  surfer photos by the defendant was in its catalog to promote its clothing.  The

7  Ninth Circuit concluded that the defendant's use was commercial in nature and

8  therefore not entitled to the full First Amendment protection.  See Downing, 265

9  F.3d at 1002 and n. 2.  There is no similarity between the profiles posted on

10 Matchmaker, which contain information posted by members about themselves,

11 and the clothing catalog in Downing which used the photographs "essentially as

12 window-dressing to advance the catalog's surf-theme."  Id. at 1002; see also

13 Gionfrido v. Major League Baseball, 94 Cal. App. 4th 400, 412, 114 Cal. Rptr. 2d

14 307 (2001) ("It was not the business of the messenger, but the commercial nature

15 of the message that distinguished the [Hoffman and Downing] decisions."

16       Thus, this Court concludes that the Profile does not constitute

17 commercial speech, and therefore, the actual malice standard does apply,

18 precluding Plaintiff's claim for misappropriation of the right of publicity and

19 entitling Defendants to summary judgment with respect to this cause of action.

20       **5.     Defendants are entitled to summary judgment with respect**

21             **to Plaintiff's cause of action for negligence**

22       In support of her fourth cause of action for negligence, Plaintiff

23 argues that Defendants were negligent by: (1) failing to enforce their own policies

24 prohibiting publication of street addresses, email addresses and offensive, sexually

25 suggestive language; (2) failing to heed any of the warning signs that the Profile

26 was a hoax, most notably, the automatic response they received; (3) failing to

27

28                                    33

1  remove the Profile after being told it was false; and (4) failing to train its system
2  operators, particularly with respect to handling false profiles.

3       In seeking summary judgment with respect to this cause of action,
4  Defendants rely on the same arguments they made with respect to the defamation
5  claim - that Plaintiff is a public figure and cannot establish by clear and
6  convincing evidence that Defendants acted with constitutional actual malice.
7  Plaintiff responds that the facts giving rise to her negligence claim consist of "far
8  more than defamatory words."

9       This Court agrees with Defendants that Plaintiff's negligence claim is
10  dependent on her defamation claim. While Plaintiff attempts to allege four
11  separate omissions or acts by Defendants as negligence, each rests on the alleged
12  falsity of the Profile. Absent "publication" of the Profile by Defendants, Plaintiff
13  has no negligence claim. As the Fourth Circuit stated in Zeran:

14            Although [Plaintiff] attempts to artfully plead his claims
15            as ones of negligence, they are indistinguishable from a
16            garden variety defamation action. Because the
17            publication of a statement is a necessary element in a
18            defamation action, only one who publishes can be
19            subject to this form of tort liability. [Citations.]
20            Publication does not only describe the choice by an
21            author to include certain information. In addition, both
22            the negligent communication of a defamatory statement
23            and the failure to remove such a statement when first
24            communicated by another party - each alleged by
25            [Plaintiff] here under a negligence label - constitute
26            publication. [Citations.]

27
28                                    34

1  Zeran, 129 F.3d at 332.  Similarly, here, publication of the Profile not only

2  describes the choice by an author to include certain information, but it also

3  includes both the negligent communication of the Profile and the failure to remove

4  the Profile.  Thus, Plaintiff's attempt to recover damages from Defendants based

5  on the asserted acts or omissions of Defendants fails with Plaintiff's defamation

6  claim.

7          As mentioned above, Plaintiff argues that the facts giving rise to the

8  negligence claim consist of far more than defamatory words.  In support, she cites

9  to the sole case of Flynn v. Higham, 149 Cal. App. 3d 677, 682, 197 Cal. Rptr. 145

10 (1983), wherein the court did not allow an independent cause of action for

11 intentional infliction of emotional distress based on the same acts which would not

12 support a defamation action.  The Flynn court, however, distinguished its case

13 from another case wherein a court did allow an infliction of emotional distress

14 claim even though it dismissed the slander claim.  See Lagies v. Copley, 110 Cal.

15 App. 3d 958, 168 Cal. Rptr. 368 (1980).  The court stated that "the facts giving

16 rise to the infliction of emotional distress allegation [in Lagies] consisted of far

17 more than defamatory words." Flynn, 149 Cal. App. 3d at 682.  Specifically,

18 "[a]ccording to plaintiff's pleadings, defendants, standing in a position of

19 authority over him, and for the purpose of causing him to suffer such distress,

20 intentionally humiliated plaintiff, refused to print his stories, singled him out for

21 denial of merit raises, demoted him, black-balled him, thus precluding other

22 employment, published Lagies' confidential sources, thus destroying his

23 credibility as capability for being an investigative reporter, all without just cause

24 of provocation." Id. (citing Lagies, 110 Cal. A00. 3d at 974).  Here, by contrast,

25 Plaintiff's negligence claim does not consist of "far more" than the publication of

26 the Profile.

27

28                                    35

1    In <u>Blatty v. New York Times Co.</u>, 42 Cal. 3d 1033 (1986), the

2  plaintiff, an author of a novel, brought an action against a newspaper based upon

3  the newspaper's failure to include the novel on its best seller list.  The plaintiff

4  asserted negligent interference with prospective economic advantage, negligence,

5  trade libel and intentional interference with prospective economic advantage.  The

6  California Supreme Court held that the lower court's judgment of dismissal of

7  these claims was proper.  It found that these causes of action had as their

8  gravamen the alleged injurious falsehood of the best seller list and hence were

9  required to satisfy the First Amendment requirements.  <u>See id.</u> at 1044-48.  It

10 stated:

11         Although the limitations that define the First

12         Amendment's zone of protection for the press were

13         established in defamation actions, they are not peculiar

14         to such actions but apply to all claims whose gravamen is

15         the alleged injurious falsehood of a statement: '[t]hat

16         constitutional protection does not depend on the label

17         given the stated cause of action' [citation], and no cause

18         of action 'can claim . . . talismanic immunity from

19         constitutional limitations' [citations].

20 <u>Id.</u> at 1042-43.  The Court further recognized that First Amendment limitations are

21 applicable to all claims whose gravamen is the alleged injurious falsehood of a

22 statement because "[i]f these limitations applied only to actions denominate

23 'defamation,' they would furnish little if any protection to free-speech and free-

24 press values," and plaintiffs would simply affix a label other than "defamation" to

25 their claims.  <u>Id.</u> at 1045.  This reasoning applies with equal force here.  While

26 Plaintiff may attempt to label her cause of action as "negligence" and purport to

27

28                                  36

1  describe acts or omissions constituting this "negligence," the gravamen of her

2  claim remains the alleged injurious falsehood of the Profile.

3          In sum, Plaintiff's claim - that Defendants failed (1) to enforce their

4  own policies regarding prohibiting certain publications; (2) to heed the warning

5  signs that the Profile was a hoax; (3) to remove the Profile; and (4) to train its

6  operators with respect to handling false profiles - stems from the alleged injurious

7  falsehood of the Profile.  As such, because Plaintiff cannot sustain her defamation

8  claim without evidence that Defendants acted with constitutional actual malice,

9  Plaintiff cannot sustain her claim that Defendants were negligent in publishing the

10 Profile.  Defendants are thereby entitled to summary judgment with respect to

11 Plaintiff's negligence cause of action.

12 **C.    Conclusion**

13         Defendants have demonstrated the absence of a genuine issue of fact

14 for trial with respect to each of Plaintiff's causes of action, and Plaintiff has not set

15 forth specific facts showing that there remains a genuine issue for trial.

16 Accordingly, this Court **grants** Defendants Lycos, Inc. and Metrosplash.com,

17 Inc.'s Motion for Summary Judgment.

18

19         IT IS SO ORDERED.

20

21 DATED: 3/11/02

22

23

24

25

26

27

28

**DICKRAN TEVRIZIAN**
Dickran Tevrizian, Judge
United States District Court

37